## Commonwealth *v.* Tucker, Appellant.

Argued November 10, 1971; reargued November 13, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Morris Paul Baran,* with him *Harry D. Sporkin,* for appellant.

*James T. Ranney,* Assistant District Attorney, with him *Milton M. Stein,* Assistant District Attorney,

*James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE NIX, July 2, 1973:

Appellant was found guilty by a jury of first-degree murder and aggravated robbery, and, after denial of his post-trial motions, he was sentenced to life imprisonment for the murder and ten to twenty years for the aggravated robbery, the sentences to run concurrently. The judgment of sentence on the murder conviction was appealed here and the judgment of sentence on the aggravated robbery conviction was appealed to the Superior Court. The Superior Court certified the latter appeal to this Court in order that we might consider both matters together.

A serious question is raised concerning the trial court's handling of the prosecution's interrogation of Cornell Berry, who had initially been arrested and charged with the appellant for the commission of these crimes and was subsequently acquitted in a separate jury trial of the charge of murder.[1] Berry had been called as a witness by the Commonwealth in anticipation that his testimony would conform with his statements during his trial where he had placed the entire responsibility for the murder upon the appellant.

The pertinent facts surrounding the incident were: On February 11, 1969, someone, attempting to rob James Costello in the men's room of the Family Theater in Philadelphia, stabbed Costello in the neck. Costello later died of the wound. Appellant, Allen Tucker, twenty-years old at the time, and Berry were seen running up the stairs from the bathroom soon after the

---

[1] The robbery bill was not before the jury.

killing and later both were arrested and charged with the crime. Tucker, after being warned of his constitutional rights, gave the police an accurate description of how the crime took place, but originally claimed that he had seen someone else commit it. Later, when confronted by a statement given by Berry which placed the blame on Tucker, Tucker gave a statement, the contents of which admitted the stabbing and attempted robbery of the deceased.

When Mr. Berry took the stand at the request of the Commonwealth he was first identified by the assistant district attorney as a participant in the incident (without a disclosure to the jury of the outcome of that proceeding) and then in response to questioning he admitted being present in the Family Theater in the early morning hours of February 11th. He testified that between four-thirty and five o'clock in the morning he had seen the appellant and the victim in the general area where the crime occurred. He was then asked if he had seen a knife, to which he responded he had not after first unsuccessfully attempting to invoke the protection of the Fifth Amendment to the United States Constitution. It was at this juncture that the Commonwealth sought and was granted without objection by the defense the right to cross-examine the witness. The following colloquy ensued: "BY MR. STEVENS: Q. Do you recall—near the top of the page—Mr. Machen saying to you in the course of your trial, 'All right, what is the next thing that happened?' Then the Court intervened and said something and you finally made this answer—this is about two-thirds of the way down the page. This is the answer by Charles Berry, 'Purnell went upstairs, Squeaky said I am going to get some money. I said I am not for hurting nobody.' Do you recall saying that at your trial? MR. BARAN: Your Hon-

or, at this time may we see you at side bar please? THE COURT: All right. (Whereupon a side bar discussion was held as follows.) MR. BARAN: If Your Honor please, at this I am going to object to Mr. Stevens' questions on the fact he is using this cross-examination for the purpose of introducing the evidence, the entire testimony of Mr. Berry, at a previous trial and I think that is unfair and not the purpose of—"

Unquestionably, under present Pennsylvania law, the testimony of the witness, Berry, at the time that the plea of surprise was entered did not provide a proper basis for the allowance of the impeachment of the witness by the party that had called him.

"The courts of this Commonwealth have been liberal in allowing a party to cross-examine his own witness when it is believed that the interest of truth and justice so require. E.g., Commonwealth v. Smith, 424 Pa. 544, 227 A. 2d 653 (1967); Commonwealth v. Turza, 340 Pa. 128, 16 A. 2d 401 (1940); Commonwealth v. Lehman, 309 Pa. 486, 164 Atl. 526 (1932); Commonwealth v. Spardute, 278 Pa. 37, 122 Atl. 161 (1923); Commonwealth v. Reeves, 267 Pa. 361, 110 Atl. 158 (1920); Commonwealth v. Delfino, 259 Pa. 272, 102 Atl. 949 (1918); Commonwealth v. Deitrick, 221 Pa. 7, 70 Atl. 275 (1908). In all the cited cases, however, the witness sought to be cross-examined had made statements at trial which were directly contradictory to statements the witness had made earlier, and the in-court testimony, if believed, was such as to aid the opposing party.

"On the other hand, our courts have been loath to allow cross-examination for purposes of impeachment by use of prior statements when a witness states that he does not know or that he cannot remember. This is so for the reason that such an in-court declaration

does not harm the calling party nor aid the opposing party. Goodis v. Gimbel Bros., 420 Pa. 439, 442, 218 A. 2d 574 (1966); Fisher v. Hart, 149 Pa. 232, 235, 24 Atl. 225 (1892); Selden v. Metropolitan Life Ins. Co., 157 Pa. Superior Ct. 500, 509, 43 A. 2d 571 (1945); see also McCormick, Evidence, §§38-39; Laub, Pennsylvania Trial Guide, §46.5. Hence, when a witness claims he does not know or cannot remember, the prior statements should not be introduced because of the danger that the prior statements will be considered as substantive evidence by the jury." *Commonwealth v. Knudsen, supra,* at 414-415. See also *Commonwealth v. Dancer,* 452 Pa. 221, 305 A. 2d 364 (1973).

No objection was made to the allowance of the right of cross-examination but rather to the latitude allowed to the prosecutor during the cross-examination. The record discloses that not only did the prosecutor introduce Berry's trial testimony and also a statement that had been taken by police officials upon his arrest to refute his assertion that he did not see a knife at the scene, but also introduced his version of the entire event as given in these earlier statements which fastened the blame upon the appellant. Beyond refuting the statement that he had not seen a knife, the earlier testimony and statement were used to establish that he had at one time maintained that the appellant was the one in possession of the weapon, that appellant had expressed an intention to rob someone, and that he (Berry) had attempted to restrain the appellant but that the deceased had already been fatally wounded.

"The end aimed at by [the use of prior self-contradictions] is . . . to show the witness to be in general *capable of making errors* in his testimony;" IIIA Wigmore §1017 (Chadborn rev. 1970). Thus, the prior statement is not to be used as substantive evidence. See, *Commonwealth v. Knudsen, supra* at 415 n*;

590

*Goodis v. Gimbel Bros.*, 420 Pa. 439, 442, 218 A. 2d 574 (1966).[2]

Viewing Berry's testimony with this in mind, it is clear that the prosecutor exceeded the permissible limits of cross-examination. The only statement occasioning surprise that Berry uttered during this trial was, "I didn't see no knife." The very most that the prosecutor was entitled to bring out, in view of the defense's failure to object initially to the surprise plea, was the fact that Berry had previously testified that he had seen a knife. The additional facts which the prosecutor elicited could not possibly have been relevant to show that any portion of Berry's testimony was mistaken, because at that point Berry had given no testimony concerning those facts. Thus, we find error in the scope of cross-examination afforded to the prosecution.

Unlike the situations presented in the cases of *Commonwealth v. Dancer,* supra, *Commonwealth v. Stafford,* 450 Pa. 252, 299 A. 2d 590 (1973) and *Commonwealth v. Knudsen,* supra, we cannot conclude under the facts of this case that the error was harmless. In *Dancer, Stafford* and *Knudsen* the thrust of the objection was the allowance of the right to cross-examine whereas in the case before us today that objection had been waived because of the failure of the appellant to interpose a timely objection. Here the complaint focused upon the scope of that cross-examination which permitted a number of damaging pieces of evidence to

---

[2] We note that several commentators and a few jurisdictions permit the use of prior inconsistent statements as substantive evidence because the witness is available for cross-examination and that such a rule would not violate the Confrontation Clause of the Sixth Amendment. *California v. Green,* 399 U.S. 149, 154-55 n. 5-7 (1969). However, Pennsylvania continues to adhere to the majority rule that such statements are not to be used as substantive evidence.

be placed before the jury which were totally unrelated to the statement for which impeachment was allowed. In *Stafford* and *Knudsen* the court concluded that, since the objection went to the right to cross-examine and the witnesses in the respective cases adhered to their trial testimony, no prejudice was suffered by the court's erroneous allowance of cross-examination. Here completely unrelated to the statement to be impeached —i.e., "I didn't see no knife"—the erroneous latitude granted by the Court permitted the introduction of the fact that the only eyewitness, Berry, had on two prior occasions stated not only that he had seen the knife but that it was in the hands of appellant, that appellant had expressed an intention of committing a robbery and that although he had attempted to intervene the appellant did in fact stab the victim. Although here too the witness repudiated these prior statements, prejudice resulted from the introduction of facts which the witness did not specifically controvert at trial and which served no permissible evidentiary purpose.

Nor are we in a position to conclude, as this Court did in *Dancer,* that "this error was harmless in the face of the overwhelming evidence of guilt." Berry was the only eyewitness; the only other testimony with respect to the intention of the appellant and the circumstances surrounding the incident itself was supplied by appellant's pretrial statement whose veracity was hotly contested at trial. In deciding that this error did prejudice the appellant and was not harmless we are not unmindful that the evidence against Tucker without Berry's testimony was substantially the same as that introduced in the trial against Berry which resulted in an acquittal.

Appellant has raised numerous other objections. In view of our disposition of the case, we need not pass upon those objections at this time.

The judgment of sentence is reversed and a new trial awarded.

Mr. Justice POMEROY dissents.

———

DISSENTING OPINION BY MR. JUSTICE O'BRIEN:

I must respectfully dissent from the majority's conclusion that the trial court committed reversible error when it permitted extensive cross-examination of appellant's friend, Cornell Berry, concerning statements Berry had made prior to trial, at Berry's own trial, and during a period when Berry was in custody. It might be helpful to recount the events surrounding Berry's testimony.

Berry had been called to the witness stand by the Commonwealth with the expectation, which the Commonwealth had previously noted in conference, that he would give the same testimony which he had given at his own trial, in which Berry was acquitted, when he had placed the entire responsibility for the murder on appellant. However, when Berry took the stand, he was evasive about whether he had seen appellant at the scene of the crime at the time it occurred or whether he had seen the victim go downstairs at that time. When Berry was asked whether he at any time had seen a knife, after being unsuccessful in attempting to invoke the Fifth Amendment, Berry stated that he did not see the knife. The Commonwealth, claiming surprise, was then permitted to cross-examine Berry concerning whether he had made specific statements to the contrary at his own trial. When confronted with these prior statements, Berry responded, as to each one, "I said what my lawyer told me to say." The Commonwealth went through much of Berry's previous trial testimony until he finally was asked whether he had said: "Q. Now, Mr. Berry, 'Question—you walked in where? Answer—I walked in the second area. Question—into

the room where the toilets were? Answer—yeah. Question—what did you see? Answer—I seen the knife in [appellant's] hand.' Q. Did you say that? A. Yeah, I said that. Q. 'Question—yes. Answer—so then when I walked in I went to grab [appellant] back I seen the man coughing. I said Jack you done cut that man and I walked out, all three of us went upstairs.' Q. Did you say that? A. That is what I said." Berry admitted that the above quote was what he said at his own trial, although he had not yet retracted his explanation that his lawyer "had told him to say that."

The Commonwealth next began to question Berry about the prior occasions when he had seen appellant's knife. Berry continued to be evasive and hostile to the Commonwealth's questions. The Commonwealth's attorney then asked Berry whether he had told the police what had happened. When Berry replied "They knew more than I did," and claimed he was "sleepy" and couldn't remember what he had told the police, he was read the portion of his statement which concerned the knife in the appellant's hands and was asked whether he had said that. Mr. Berry responded: "Like I said, what I said in my statement, and what I said at my trial they put in there how they felt they thought it went."

Appellant contends, and the majority is apparently of the opinion that the trial court erred in the latitude given the Commonwealth to cross-examine Berry. Admittedly the prior testimony and the statement which Berry made to the police were not limited to neutralization of Berry's testimony at trial denying that he had seen appellant with a knife at the time of the killing and upon previous occasions, but instead dealt with the entire crime. However, given the facts in this case, I do not believe the Court abused its discretion in permitting such broad cross-examination. When Berry de-

nied, on direct examination, that he had seen the murder knife in appellant's hand, this denial became a piece of substantive evidence which the jury could consider in determining its verdict. Since Berry's testimony was totally unexpected, in the light of the testimony at his own trial, it was perfectly proper for the court to permit the Commonwealth to confront Berry with his previous statement for purposes of impeaching the credibility of his denial that he actually had seen the knife.[1] If the matter had ended there, with Berry's admission of his previous remarks, it might have been error to permit any further cross-examination on the subject. However, the matter did not end there. Berry next claimed that his lawyer had told him what to say at his trial. It was then perfectly proper to permit the Commonwealth to confront Berry with all of his trial testimony and his substantially similar previous statement to the police to attack the credibility of his claim that his lawyer told him what to say at the time of his trial. (After all, Berry could not claim that his lawyer also told him what to say to the police, since his lawyer was not present at that time.)

Commonwealth v. DiPasquale, 424 Pa. 500, 230 A. 2d 449 (1967), upon which appellant relies, cannot help him because in the instant case, unlike the situa-

---

[1] This case is thus distinguishable from Commonwealth v. Dancer, 452 Pa. 221, 305 A. 2d 364 (1973). In Dancer, the Commonwealth's witness testified on direct examination that she could not see the stabbing because her line of vision was blocked. We held that this testimony did not justify permitting the Commonwealth to impeach its witness because it was not prejudicial or injurious to the Commonwealth's case. In contrast, in the instant case, Berry, although he admittedly had an unobstructed view, specifically testified that he saw no knife on the appellant, testimony which clearly prejudiced the Commonwealth's case because it could lead the jury to infer that, contrary to the Commonwealth's contention, appellant had no knife.

tion in *DiPasquale*, the court went to great pains to inform the jury that Mr. Berry's previous statements could only be considered for purposes of impeachment, not as substantive evidence. Moreover, in *DiPasquale*, the witness was called by the court, at the Commonwealth's suggestion, after the Commonwealth decided not to call the witness after she had told them she would change her testimony. Thus, in *DiPasquale*, by cross-examining the recalcitrant witness, concerning the contents of her previous statement, the Commonwealth was attempting to introduce items into evidence which it knew it would not otherwise be able to introduce. In the instant case, on the other hand, the Commonwealth did not know that Berry would change his testimony until he took the stand.

Moreover, I am of the opinion that, even if the court erred in granting the Commonwealth so much latitude in its cross-examination of Berry, under the standard established by the United States Supreme Court in *Chapman v. California*, 386 U.S. 18 (1967), such error was harmless beyond a reasonable doubt. In view of the evidence in this case, particularly appellant's full and detailed confession, the testimony of various eye-witnesses to the events occurring before and soon after the murder, and the discovery of the murder weapons at appellant's place of residence, there can be no doubt that appellant would have been convicted even if Berry had not been called to the stand.

Mr. Chief Justice Jones joins in this dissenting opinion.